**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

**Richmond Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 3:09CR358 |
| | ) | |
| ROBERT LEWIS WALKER | ) | |

**Defendant's Motion to Dismiss**

Defendant, by counsel, moves the Court to dismiss the pending indictment on the ground

that 18 U.S.C. § 922(g)(9) is unconstitutional on Second Amendment grounds.

***Relevant Facts***

According to Amelia County Sheriff's Office reports, officers responded to a reported

domestic dispute between Mr. Walker and his live-in girlfriend at defendant's home on

November 12, 2008.  The alleged verbal and physical assaults did not involve a firearm or

weapon of any kind.  After Mr. Walker was arrested, however, an officer learned that there was a

Remington Model 1187 12-gauge shotgun under the bed, unloaded and still in its black carrying

case.  Subsequent investigation disclosed that Mr. Walker had several prior convictions for

misdemeanor crimes of domestic violence in 1994 and 1997.

Investigation also disclosed that Mr. Walker's father had given the shotgun to him as a

present, because the defendant is an ardent hunter.  The defendant admitted to authorities that the

shotgun was his.  He said he had shot the gun only two or three times, at "two monster bucks"

and a dove, and that he did not know he could not have a hunting gun.

### *Discussion and Analysis*

The cases most authoritative and relevant for purposes of this motion are *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008), *United States v. Chester*, Case No. 09-4084, slip op. (4th Cir. Feb. 23, 2010), and *United States v. Skoien*, 587 F.3d 803 (7th Cir. 2009), *vacated and reh'g en banc granted*, Case No. 08-3770, order (7th Cir. Feb. 22, 2010).  Although *Skoien* has been vacated, the rationale of that case and *Chester* remain valid constructions of *Heller* as applied to this case, and warrant dismissal.

What follows will include a discussion of the above-referenced cases.  It will expand upon the accurate observation in *Chester* that most courts considering challenges like this one since *Heller* have lacked any critical analysis.  Rather, they have unjustifiably presumed that the firearm prohibition represented by 18 U.S.C. § 922(g)(9) falls neatly within the Court's claim in *Heller* that its opinion should not cast doubt on the legality of other "long standing" firearm prohibitions, like those on convicted felons and the mentally ill, or those barring possession in particularly sensitive places.

### *District of Columbia v. Heller*

Notwithstanding its length and probing historical analysis, the most relevant portions of the opinion may be briefly summarized as follows.

First, the Second Amendment right to keep and bear arms encompasses a personal right to "have weapons," broadly defined as "any thing that a man wears for his defence, or takes in to his hands" for such purpose, without limiting that right to weapon possession in service of the militia or military.  *See Heller*, 128 S. Ct. at 2790-93, 2818 & accompanying notes (internal quotations and citations omitted).

Second, "the people" blessed with Second Amendment rights include "all members of the political community, not an unspecified subset." *Id.* at 2790-91; *see also id.* at 2791 ("We start therefore with a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans.").

Third, "Putting all of these textual elements [of the Second Amendment] together, we find that they guarantee the individual right to possess and carry weapons in case of confrontation." *Id.* at 2797.

Fourth, however, while self defense and confrontation were the more salient issues before the Court, *Heller* also plainly views the Second Amendment as encompassing a right to possess firearms for hunting purposes, as well.  In discussing the prefatory phrase to the right described in the Second Amendment (i.e., "A well regulated Militia being necessary to the security of a free State"), the Court rejected the notion that it limited "the right of the people to keep and bear Arms," which it declares "shall not be infringed," to the right to keep and bear arms in connection with militia operations.   "The prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right; *most undoubtedly thought it even more important for self-defense and hunting*." *Id.* at 2801 (emphasis added); *see also id.* at 1792 n.7 (referring to 18th century writings that used the phrase "keep arms" in connection with various purposes, including hunting; *id.* at 2804 (noting "highly influential minority proposal in Pennsylvania" for Second Amendment text included bearing arms for hunting, and plainly referred to the right as an individual one).  Dissenting justices also appeared to pair personal self-defense and hunting together.  *See id.* at 2822 (while right to use weapons for certain military purposes plainly granted by Second Amendment, "Whether it also protects the right to possess

and use guns for nonmilitary purposes like hunting and personal self-defense is the question presented by this case.") (Stevens, J., dissenting, joined by Souther, Ginsburg, and Breyer, JJ.); *id.* at 2825, 2840 (also pairing hunting and self-defense purposes together); *id.* at 2861 (noting that respondent, his amici, and majority all suggest that rights protected by Second Amendment include "safeguarding the use of firearms for sporting purposes, e.g., hunting and marksmanship") (Bryer, J., dissenting, joined by Stevens, Souther and Ginsburg, JJ.)

Fifth, the Second Amendment codified a pre-existing right, which had been treated as one of the "fundamental rights of Englishmen." *Id.* at 2798 (citing *Alden v. Maine*, 527 U.S. 706, 715 (1999)); *see also, e.g.,* Andrew R. Gould, Comment:  *The Hidden Second Amendment Framework within* District of Columbia v. Heller*, 62 Vand. L. Rev. 1535, 1558 & accompanying notes (2009) (noting analysis and comments of Court in *Heller* are consistent with viewing personal Second Amendment right as a fundamental one).

Sixth, the Court recognized the validity of limitations on the right to keep and carry weapons, such as concealed weapon limitations.  *Id.* at 2816.  In perhaps the most over-read (but underanalyzed) single sentence of its opinion, the Court added the following:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 2816-17.  This passage concluded with a footnote reading, "We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive."  *Id.* at 2817 n.26.

Finally, of course, *Heller* held that the District of Columbia's ban on handgun possession in the home violated the Second Amendment, as did its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense.  *Id.* at 2821-22.

In arriving at that result, the Court's opinion in *Heller* made several references to the appropriate level of scrutiny for a Second Amendment challenge.  Noting that "the inherent right of self-defense has been central to the Second Amendment right," it added that the DC handgun ban "amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society" for that purpose.  "Under any of the standards of scrutiny that we have applied to enumerated constitutional rights," banning the possession and use of guns from the home would fail constitutional muster.  *Id.* at 2817-18 (footnote omitted).

Two comments from an accompanying footnote are especially noteworthy.  "Obviously, the [rational basis] test could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against double jeopardy, the right to counsel, or the right to keep and bear arms."  *Id.* at 2817 n.27.  The Court added, "If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."  *Id.*

Addressing the dissenting Justice Breyer's proposal for an "interest balancing inquiry" to evaluate Second Amendment restrictions, the Court rejected both that proposed test, and Breyer's view that the DC law would pass it.  *See id.* at 2821 (discussing dissent by Breyer, J.).  It noted that the Second Amendment, like the First Amendment, "is the very *product* of an interest-balancing by the people," and that such rights were "enshrined with the scope they were

understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id.*

Justice Breyer falsely assumed that there were "somewhat similar restrictions" to modern DC's "in the founding period," according to the Court. *Id.*. Rather, the laws Breyer cited were motivated by fire safety and probably unenforced against one holding or storing a weapon for self-defense, or just restricted the time or place or use of arms instead of banning possession outright, punishing offending conduct with minor fines or jail terms. *Id.* at 2819-20. "The District law, by contrast, far from imposing a minor fine, threatens citizens with a year in prison (five years for a second violation) for even obtaining a gun in the first place." *Id.* at 2821.

As for Justice Breyer's complaint that the Court did not provide "extensive historical justification for those regulations of the right that we describe as permissible" the Court noted that there "will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." *Id.*

### *Chester* and *Skoien*

The defendant in *Chester* had a prior qualifying misdemeanor conviction for purposes of 18 U.S.C. § 922(g)(9). Two years after that conviction, firearms were found in his house when police responded to another domestic complaint, prompted by his choking his wife and threatening to kill her, after she had found him outside the home receiving oral sex from a prostitute. *United States v. Chester*, Case No. 09-4084, slip op. at 4-5 (4th Cir. Feb. 23, 2010).

Charged with possessing a firearm in violation of § 922(g)(9), he moved to dismiss based on *Heller*. The district court summarily denied the motion, with little legal analysis or factual

record, beyond assuming that the § 922(g)(9) prohibition fell within the Court's two sentences about "longstanding prohibitions" which were "presumptively lawful." *Id.* at 2-3, 13-14.

The Fourth Circuit went on to agree with the now vacated panel decision in *Skoien* that "challenges to firearms requirements under the Second Amendment must be individually analyzed because such regulations restrict the exercise of a constitutional entitlement." *Id.* at 3 (citing *United States v. Skoien*, 587 F.3d 803, 808 (7th Cir. 2009), *vacated and reh'g en banc granted*, Case No. 08-3770, order (7th Cir. Feb. 22, 2010)). It also noted the Court's emphasis in *Heller* that the Second Amendment right encompassed the "core lawful purpose of self-defense" or confrontation. *Id.* at 8.

*Chester* also (properly) characterized most post-*Heller* decisions, including the district court's it was reviewing, as overly simplistic. Challenges to firearm restrictions *explicitly* identified as "presumptively lawful" in *Heller*—i.e., prohibitions on possession by felons or the mentally ill, "sensitive place" based restrictions, and restrictions on commercial sales—could logically be deemed precluded by the *Heller* dicta, absent later Supreme Court pronouncements casting doubt on that dicta. But courts which expanded that dicta to include other, unspecified restrictions "via analogy," failed to use the appropriate analysis. *See id.* at 10-11 & accompanying notes.[1]

---

[1] Among those decisions taking the "presumptively lawful by analogy" approach for § 922(g) prohibitions other than (g)(1) for felons are the following: *United States v. White*, 2010 U.S. App. LEXIS 542, ** 15-17 (11th Cir. 2010) ((g)(9) case); *United States v. Richard*, 2009 U.S. App LEXIS 23018, * 19 (10th Cir. 2009) ((g)(3) "unlawful user" case); *In re United States*, 578 F.3d 1195, 1200 (10th Cir. 2009) ((g)(9)); *United States v. Lacy*, 2009 U.S. Dist. LEXIS 103532, ** 3-6 (E.D. Wisc. 2009) ((g)(3)); *United States v. Holbrook*, 613 F. Supp. 2d 745, 776 (W.D. Va. 2009) ((g)(9) & § 922(a)(6)); *United States v. Booker*, 570 F. Supp. 2d 161, 163 (D. Maine 2008) ((g)(9)).

"Instead, it seems clear that cases that fall outside the specific exceptions in *Heller* warrant independent constitutional scrutiny." *Id.* at 13.

*Chester* summarized the two-part analytical approach for such independent scrutiny adopted in *Skoien* as follows.  First, under historical analysis, "some gun laws will be valid because they regulate conduct that falls outside the terms of the right as publicly understood when the Bill of Rights was ratified.  If the government can establish this, then the analysis need go no further." *Id.* (quoting *Skoien*, 587 F.3d at 808-09).  Second, those laws "without the proper historical pedigree" would be "'valid (or not) depending on the government's ability to satisfy whatever level of means-end scrutiny is held to apply[.]'" *Id.* (quoting *Skoien*, 587 F.3d at 809).

Noting that the record before it was as empty of relevant facts or legal analysis as the record reviewed by the Seventh Circuit panel in *Skoien*, the Fourth Circuit in *Chester* likewise remanded, with instructions that the district court "must conduct an analysis of the constitutional validity of § 922(g)(9) which is 'independently justified,'" and "should consider and interpret the historical analysis from *Heller*," but without being "bound by the threshold test articulated in *Skoien*." *Id.* at 15.  "It should also identify, justify, and apply an appropriate level of constitutional scrutiny." *Id.* at 15.

The Fourth Circuit in *Chester* went on to describe how *Skoien* selected intermediate scrutiny because of its view that the core Second Amendment right was reserved to "'law-abiding, responsible citizens, to use arms for their 'natural right of armed defense,'" and the defendant in that Seventh Circuit case was "not 'law-abiding,' and he used his gun for hunting, not for self-defense." *Id.* at 15 (quoting *Skoien*, 587 F.3d at 812).  While adding that Chester was not law-abiding and therefore "at least one step 'removed from the core constitutional right,'" the

Fourth Circuit was more distressed by the absence of a factual record as to what Chester's reason was for possessing his guns, and therefore "which right or rights specifically applied to him." *Id.* at 16 (quoting *Skoien*, 587 F.3d at 812).  It accordingly directed the district court to require the defendant to identify the basis of his claim to Second Amendment protection, and make a record to support it, to which the Government may respond.  *Id.*  "Then the district court can rule based on a full and complete record as to what level of scrutiny applies, thereby creating a sufficient record to permit appellate review."  *Id.*

### *Application to Walker's Motion*

#### *Walker Claims a Right at the Core of the Second Amendment*

As noted above, Walker was given, kept, and used the shotgun solely for hunting purposes.  This directly implicates a lawful Second Amendment purpose of self-defense recognized by *Heller* and *Skoien*.  Indeed, as *Heller* pointed out, hunting was often identified as a principal reason for the right to bear arms, thought by most Americans on a part with the purpose of self-defense, and more important than for preserving the militia.  *District of Columbia v. Heller*, 128 S. Ct. 2783, 2801 (2008).

#### *This Second Amendment Right is Subject to Strict Scrutiny*

*Heller* categorically rejected the application of rational basis review.  *Heller*, 128 S. Ct. at 2817 n.27.  *Chester* by its terms and analysis does not categorically reject application of strict scrutiny here.  Strict scrutiny is the right standard to apply.

*Heller* twice refers to the Second Amendment right to "have arms" as fundamental. *Heller*, 128 S. Ct. at 2798.  It also recognized that early Americans valued the right to possess

arms for self-defense and hunting as even *more* important than the right to possess them for preserving the militia.  *Id.* at 2801.

The Court has generally applied strict scrutiny in reviewing claims burdening fundamental rights.  *See, e.g., Harper v. Virginia Bd. of Elections*, 383 U.S. 663 (1966); Erwin Chemerinsky*, Constitutional Law: Principles & Policies* § 10.1.1 (3d ed. 2006).

Justice Scalia—coincidentally the author of the Court's opinion in *Heller* which twice calls the personal Second Amendment right fundamental—has argued that all fundamental rights should be subject to strict scrutiny.  *See United States v. Virginia*, 518 U.S. 515, 568 (1996) (Scalia, J., dissenting).

There are several reasons why this Court should not read *Chester* as compelling (or even supporting) application of the lower, intermediate level of scrutiny selected in *Skoien*.

First, *Chester* does not hold that intermediate scrutiny is proper for a § 922(g)(9) challenge.  At most, it indicates that the level of scrutiny applicable may vary depending on (1) whether the defendant is deemed law-abiding, and (2) his reason for possessing a gun.  *See Chester*, slip op. at 15-16.

Second, *Heller* did not in its two spare sentences about "presumptively lawful" firearms regulations either state or suggest that a different level of scrutiny should apply just because a citizen at some time in the past committed an unlawful act.

A third and related point is that *Heller* did *not* by its terms limit the Second Amendment right to "law-abiding" citizens, however that term is defined.  *See supra* page 3 (discussing *Heller*'s definition of "the people" with pre-existing Second Amendment rights); *see also Saenz v. Roe*, 526 U.S. 489, 524 (1999) (Rehnquist, C.J., & Thomas, J., dissenting) (Second

Continental Congress recognized in Articles of Confederation that fundamental rights extended to all "free inhabitants" of a state, excluding only "paupers, vagabonds and fugitives from justice").

Fourth, the use of the term "law-abiding" in the Court's opinion in *Heller* does not suggest that it can or should be construed to mean anyone who has, at some time in the past, committed an unlawful act. The Court clearly acknowledged the validity of numerous restrictions imposed at the time of the founding, or restrictions based on a rationale of fire safety, which would have exposed bearers of arms to criminal fines or even jail time. *District of Columbia v. Heller*, 128 S. Ct. 2783, 2819-21 (2008). Yet, there no suggestion by *any* Justice in *Heller* that those historical restrictions were based categorically on a broad description of the people governed according to past conduct or misconduct. Rather, those restrictions were based on present conduct, or on time, manner and place restrictions on possession of arms. Even more important, the Court did not suggest in *Heller* that a person who *was* previously punished for such proscribed gun possession, was then (or could now) be subjected to a permanent prohibition on having a gun for protected purposes like self-defense or hunting. In other words, in lay terms, people punished under those founding-times regulations were "not law-abiding," and yet their discrete violations did not appear to generate a lifetime ban on firearm possession, as § 922(g)(9) does for every person with a single prior misdemeanor crime of domestic violence.

Fifth, felons and the mentally ill were the only two "presumptively lawful" restrictions identified in *Heller* and based on a classification of the person involved, as opposed to a description of the place or time of possession, or the manner of commercial sale. This makes perfect sense in the historical context, because of the limited access of felons and the mentally ill

in society generally in early America.  Most felony convictions were met with a death sentence.

*See, e.g., Lockett v. Ohio*, 438 U.S. 586, 598 (1978).  The mentally ill were historically presumed

"unable to control their behavior" and often described as "famously mad."  *See Kan v. Hendricks*,

521 U.S. 346, 357 (1997).  "Until well into the nineteenth century, the vast majority of such

persons were simply restrained in poorhouses, almhouses, or jails."  *O'Connor v. Donaldson*,

422 U.S. 563, 583 (1975) (Burger, C.J., concurring).

Sixth, even *Skoien* does not treat a prior misdemeanor conviction as the sole or even

primary reason for its rationale that intermediate scrutiny applies.  Rather, that vacated panel

opinion first emphasized the very reference in *Heller* to "presumptively lawful" gun regulations.

That concept, it suggested, is "obviously incompatible" with application of a strict scrutiny

standard, under which "there is reason to doubt whether Skoien's conviction under § 922(g)(9)

could survive Second Amendment challenge."  *Skoien*, 587 F.3d at 810-11 & n.5.

Seventh, *Skoien* explicitly recognized that a "severe burden on the core Second

Amendment right of armed self-defense should require strong justification."  It added that

intermediate scrutiny requiring only a "reasonable fit" between the regulation and an "important

governmental end" logically applies "for gun laws that do not severely burden the core Second

Amendment right of self-defense."  *Id.* at 814.  The problem with this conclusion is that it rests

on the assumption that a weapon prohibition that prevents hunting and is premised solely on the

defendant's prior misdemeanor conviction for domestic violence lies outside the "core" Second

Amendment right.  As already noted, the Supreme Court in *Heller*—the majority and dissenters

alike—treated self-defense and hunting as comparable rights, both subject to Second Amendment

protection.  As also noted above, *Skoien* read the concept of "law-abiding" too broadly, both in

terms of what that term means on its face, and in treating it as an essential ingredient to its

holding or to its characterization of the Second Amendment's "core lawful purpose of self-

defense." *See Heller*, 128 S. Ct. at 2818.  This law, § 922(g)(9), imposes an "automatic,

exceptionless, and perpetual firearms prohibition" on Mr. Walker or persons in his position, for

any purpose, including hunting.  The law therefore requires strong justification.

### The Prohibition Does Not Satisfy Strict Scrutiny

A law subject to strict scrutiny must be narrowly tailored to achieve a compelling

governmental interest.  *E.g., Skoien*, 587 F.3d at 811 n.5.  Assuming for the sake of argument that

preventing domestic gun crime is a compelling governmental interest, *see id.* (citing *United

States v. Salerno*, 481 U.S. 739, 749 (1987)), it must still bear the burden of establishing that "§

922(g)(9)'s automatic, exceptionless, and perpetual firearms prohibition is the least restrictive

means available to achieve this goal." *Id.*  It is unlikely to be able to do that, in part because

strict scrutiny is "fatal in fact." *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003).  In addition, §

922(g)(9) is not (by contrast to § 922(g)(8)) premised on a finding that the defendant is a

continuing danger to anybody.

The motion to dismiss should therefore be granted.[2]

---

[2] Even if this Court were to determine that intermediate scrutiny applies, it remains the
Government's burden to justify the § 922(g)(9) prohibition, with evidence in the record.  *See,
e.g., Skoien*, 587 F.3d at 814.

Respectfully submitted,

ROBERT LEWIS WALKER


By: _____/s/_____
            Counsel
Paul G. Gill
VSB No. 31461
Assistant Federal Public Defender
Office of the Federal Public Defender
701 East Broad Street, Suite 3600
Richmond, VA 23219-1884
(804) 343-0800
Paul_Gill@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of March, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following: David Maguire (David.Maguire@usdoj.gov), and Mary E. Maguire (mary_maguire@fd.org).


_____/s/_____
Paul G. Gill
VSB No. 31461
Assistant Federal Public Defender
Office of the Federal Public Defender
701 East Broad Street, Suite 3600
Richmond, VA 23219-1884
(804) 343-0800
Paul_Gill@fd.org