IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 3:09-cr-358 |
| | ) | |
| ROBERT LEWIS WALKER, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## UNITED STATES' RESPONSE TO MOTION TO DISMISS

The United States respectfully requests that this Court deny the motion by defendant

Robert Lewis Walker to dismiss count one of the indictment, charging him with a violation of 18

U.S.C. § 922(g)(9).  Contrary to defendant's contention, § 922(g)(9) does not violate the Second

Amendment.

The Supreme Court has explained that prohibitions such as that in 18 U.S.C. § 922(g)(1)

on felons possessing firearms are presumptively valid under the Second Amendment.  *District of*

*Columbia v. Heller*, 128 S. Ct. 2783, 2816-17 (2008).  And the Court's list of presumptively

valid firearm prohibitions—such as the limits on gun possession by felons, the mentally ill, and

those in sensitive places like schools and government building—are merely "examples" and not

"exhaustive."  *Id.* at 2817 n.26.  Given that Congress may prohibit those who commit nonviolent

felonies, like price fixing or tax evasion, from possessing a firearm, Congress may equally

prohibit those convicted of assaulting someone in their family from possessing firearms, where

the risk of violence is much greater.  Section 922(g)(9) is presumptively valid and should be

1

upheld just as § 922(g)(1) has been.  Although lawyers sometimes approach a question of

constitutional law as if the required legal analysis must always have as many gears, springs, and

screws as a Swiss watch, the fundamental issue in this case is quite simple.  Section 922(g)(1) is

not materially different from § 922(g)(1) under the Second Amendment.  But even if this Court

were to conclude that a more detailed analysis of § 922(g)(9) under either intermediate or strict

scrutiny is required, the result would be the same, as explained below.

Moreover, even if this Court were to disagree with the United States that § 922(g)(9) is

constitutional in all its applications, defendant still cannot prevail on a motion to dismiss the

indictment.  Defendant does not purport to raise a facial challenge to § 922(g)(9), and that is

unsurprising given that, under a facial challenge, every application of the statute would have to

be unconstitutional.  "A facial challenge to a legislative Act is, of course, the most difficult

challenge to mount successfully, since the challenger must establish that no set of circumstances

exists under which the Act would be valid."  *United States v. Salerno*, 481 U.S. 739, 745 (1987).

Facial challenges, as the Supreme Court has explained, "invite judgments on fact-poor records"

and "call for relaxing familiar requirements of standing, to allow a determination that the law

would be unconstitutionally applied to different parties and different circumstances from those at

hand."  *United States v. Sabri*, 541 U.S. 600, 609 (2004).

But once defendant abandons a facial challenge, and instead raises an as-applied

challenge on a developed set of facts, he faces the problem that his as-applied challenge is being

raised in a pretrial motion to dismiss.  A motion to dismiss an indictment is governed by FED. R.

CRIM. P. 12, and under that rule, a pretrial motion to dismiss is not a mechanism that a defendant

may use for obtaining summary judgment on a defense.  As courts have observed, "A motion to

dismiss the indictment cannot be used as a device for a summary trial of the evidence. . . .  The

Court should not consider evidence not appearing on the face of the indictment." *United States*

*v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002) (quoting *United States v. Jensen*, 93 F.3d 667, 669

(9th Cir. 1996); *United States v. Marra*, 481 F.2d 1196, 1199-1200 (6th Cir. 1973)).  Thus, a

district court may not make a pretrial ruling dismissing an indictment under Rule 12(b)(2) for a

constitutional defense when doing so would depend on facts beyond those listed in the face of the

indictment.  As the rule provides, "A party may raise by pretrial motion any defense, objection,

or request that the court can determine *without a trial of the general issue*."  FED. R. CRIM. P.

12(b)(2) (emphasis added).  A court may determine a defense without a trial of the general issue,

the Supreme Court has explained, only when facts beyond those in the indictment would be of no

assistance in evaluating the defense:  "A defense is thus 'capable of determination' [on a pretrial

motion to dismiss] if trial of the facts surrounding the commission of the alleged offense would

be of no assistance in determining the validity of the defense." *United States v. Covington*, 395

U.S. 57, 60 (1969).

  Courts may of course receive evidence and make factual findings on pretrial motions to

suppress evidence, for example, *see* FED. R. CRIM. P. 12(d), but an as-applied constitutional

defense to a criminal charge may not be resolved through judicial fact finding if the face of the

indictment does not supply enough facts.  *See, e.g., United States v. Reed*, 114 F.3d 1067, 1068,

1070-71 (10th Cir. 1997) ("as applied" vagueness challenge cannot be raised on motion to

dismiss); *United States v. Poulin*, 588 F. Supp.2d 58, 60-62 (D. Me. 2008) (as-applied

constitutional challenge could not be decided on motion to dismiss).

As discussed below, the facts alleged in the indictment are sufficient to *deny* defendant's motion to dismiss, for all charges that meet the statutory requirements of § 922(g)(9) are permissible under the Second Amendment.  But if this Court disagrees and believes that an as-applied challenge like defendant's could succeed, a motion to dismiss under Rule 12(b) would not provide a permissible mechanism to rule in defendant's favor.

For the sake of completeness, the United States lists below the background facts underlying defendant's offense.  Although again this Court need not consider those facts in denying defendant's motion, since all charges that meet the requirements of § 922(g)(9) are constitutional under the Second Amendment, the background facts below would all surely be relevant to deciding any as-applied challenge if such challenges were not foreclosed by *Heller*.

## I.       Factual Background

Count one of the indictment charges defendant with possessing a Remington, Model 1187, 12-gauge semi-automatic shotgun on November 12, 2008.  Police discovered the gun in defendant's residence in Amelia, Virginia, after responding to a call about a domestic dispute. Defendant, the subject of the call, has repeatedly committed domestic-violence offenses and has four convictions for misdemeanor crimes of domestic violence—two convictions in 1994, a third in 1997, and a fourth on November 12, 2008, the date that police seized the gun that led to the present federal charge under § 922(g)(9).  Thus, in this case, defendant is raising an as-applied Second Amendment challenge when his illegal gun possession occurred *contemporaneously* with an assault on a family member and even though he has three previous convictions for domestic assault and battery.

4

Defendant's criminal history, moreover, is not limited to domestic assault and battery. He also has convictions for driving while intoxicated in 1991, contempt of court in 1999, petit larceny in 2003, attempt to possess cocaine base in 2003, petit larceny in 2006, driving while intoxicated with a blood-alcohol level greater than 0.20 in 2008, and driving on a revoked license in 2009.  In total, defendant has eleven misdemeanor convictions.

The circumstances surrounding defendant's domestic violence offense and illegal firearm possession on November 12, 2008 are as follows.  Officers arrived at defendant's residence and found Debora Leneave bleeding from the left side of her head.  Ms. Leneave told the officers that her boyfriend, the defendant Robert Walker, had been arguing with her and her daughter, Danielle Leneave.  Defendant had flipped Debora Leneave out of the chair that she was sitting in. She stood up and pushed defendant back, and after they argued some more, defendant threw some things outside and tore Ms. Leneave's dream catcher off of the wall.  After Ms. Leneave pushed defendant again, he threw her against a wall, cutting her head.

Ms. Leneave's daughter, Danielle, added further details of defendant's attack on her mother.  Danielle said that defendant had come home drunk and said, "I don't want to hear no shit."  Danielle went into her room and could hear defendant and her mother arguing.  When she came out to see what was happening, defendant ordered her to get back in her room.  Inside her room, she heard her mother say, "motherfucker, don't put your hands on me."  Danielle came out of her room again in time to see defendant standing over top of her mother, who was sitting in a rocking chair.  Danielle then saw defendant hit her mother and knock her out of the chair.

After officers arrived and read defendant his *Miranda* rights, defendant said that he and Debora had been living together for two years.  He said that he was arguing with Danielle

5

because her baby was crying and he told her to tell the baby to be quiet or leave.  Defendant

claimed that, when he walked down the hall, Debora pushed him into the wall.  Defendant

continue that he told Debora to get off him and leave him alone.  He said that when he went back

down the hall, Debora was blocking him and that he pushed her with his chest, causing her head

to hit a hanger on the wall.

One of the officers on the scene, Sergeant Davis, asked Debora Leneave if there were any

weapons in the house, and she said there was one under the bed.  She led Sergeant Davis to the

bedroom and pulled out the shotgun, saying that it belonged to defendant.  Sergeant Davis asked

defendant about the gun, and he admitted that it was his.

In a later interview on February 9, 2010, defendant said that he used the gun for hunting

and claimed that he believed that he could lawfully possess it.

## II.     Under the Second Amendment, Congress may prohibit those who have been convicted of domestic-violence offenses from possessing a firearm.

Defendant has moved to dismiss count one of the indictment charging him with

possessing a firearm after having been convicted of a misdemeanor crime of domestic violence,

in violation of 18 U.S.C. § 922(g)(9).  According to defendant, that charge violates his Second

Amendment right to bear arms, as recently construed in *District of Columbia v. Heller*, 128 S. Ct.

2783 (2008).  Defendant's claim is without merit.

The Second Amendment provides, "A well regulated Militia, being necessary to the

security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

U.S. Const., Amend. II.  In *Heller*, the Supreme Court held that the Second Amendment provides

an individual with a right to possess and use a firearm for lawful purposes, such as self-defense

within his home.  Applying that right, the Court held unconstitutional two District of Columbia

statutes to the extent that they totally banned handgun possession in the home and required all

firearms within homes to be to kept inoperable at all times, and thus unavailable for the lawful

purpose of self-defense.  At the same time, *Heller* established that, like other constitutional

rights, the individual right protected by the Second Amendment is subject to appropriate and

reasonable restrictions.  128 S. Ct. at 2816 ("the right secured by the Second Amendment is not

unlimited.").  The Supreme Court made clear that its holding addressed only "law-abiding,

responsible citizens," *id.* at 2821, and emphasized that "nothing in [its] opinion should be taken

to cast doubt on longstanding prohibitions on the possession of firearms by felons and the

mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and

government buildings . . . ."  *Id.* at 2816-17.  The Court further noted that these "presumptively

lawful regulatory measures" were merely "examples," and that its "list [did] not purport to be

exhaustive."  *Id.* at 2817 n.26.  Thus, like other constitutional rights, the individual right

protected by the Second Amendment is not absolute, but is subject to restrictions.

### A.       *Section 922(g)(9) is presumptively lawful.*

Section 922(g)(9) provides one appropriate and permissible restriction on an individual's

right to possess firearms.  Section 922(g)(9) prohibits firearms possession by a person, like

defendant, who has been convicted of a "misdemeanor crime of domestic violence," as that term

is defined in 18 U.S.C. § 921(a)(33)(A).  Under that definition, a "misdemeanor crime of

violence" is an offense, committed by a person in a domestic relationship with the victim, that "is

a misdemeanor" and that "has, as an element, the use or attempted use of physical force, or the

threatened use of a deadly weapon." 18 U.S.C. § 921(a)(33)(A)(i) and (ii).

As the Supreme Court has recognized, § 922(g)(9) addresses a serious problem. "Firearms and domestic strife are a potentially deadly combination nationwide." *United States v. Hayes*, 129 S. Ct. 1079, 1087 (2009).   Indeed, in adopting § 922(g)(9), Congress cited evidence showing that, "in households with a history of battery, the presence of a gun increases the likelihood that a woman will be killed threefold[.]"  142 Cong. Rec. S11,227 (daily ed. Sept. 25, 1996) (statement of Sen. Lautenberg).  Moreover, "many people who engage in serious spousal or child abuse ultimately are not charged with or convicted of felonies," but "are, at most, convicted of a misdemeanor."  142 Cong. Rec. 22,985 (1996) (statement of Sen. Lautenberg). Accordingly, Congress enacted § 922(g)(9) as a supplement to the federal felon-in-possession law, 18 U.S.C. § 922(g)(1), intending to "close this dangerous loophole and keep guns away from violent individuals who threaten their own families."  *Id.* at 22,986.   By "keeping deadly firearms away from persons reasonably adjudged by Congress to be dangerous or irresponsible, as well as preventing victims of domestic violence from being killed by their attackers with a firearm," this statute undeniably serves a vital government interest.  *Gillespie v. City of Indianapolis*, 13 F. Supp.2d 811, 827 (S.D. Ind. 1998).

Moreover, in analyzing constitutional challenges, courts must still defer to the factual findings of Congress.  "[D]eference must be accorded to [congressional] findings as to the harm to be avoided and to the remedial measures adopted for that end, lest [the courts] infringe on traditional legislative authority to make predictive judgments when enacting nationwide regulatory policy."  *Heller v. District of Columbia*, 2010 WL 1140875 (D.D.C. Mar. 26, 2010) (quoting *Turner Broad. Sys., Inc. v. Fed. Communications Comm'n*, 520 U.S. 180, 195 (1997)).

8

As noted above, *Heller* identified several "regulatory measures" that are "presumptively lawful" under the Second Amendment, without purporting to provide an exhaustive list.  Relying on *Heller*'s conclusion that § 922(g)(1) is lawful categorically under the Second Amendment, numerous courts of appeals, including the Fourth Circuit, have upheld convictions under § 922(g)(1) against constitutional challenge.  *See, e.g.*, *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009), *cert. denied*, 2010 WL 680526 (U.S. Mar. 1, 2010); *United States v. Anderson*, 559 F.3d 348, 352 n.6 (5th Cir.), *cert. denied*, 129 S. Ct. 2814 (2009); *United States v. Battle*, 2009 WL 3065103  at *1-*2 (11th Cir. Sept. 28, 2009) (unpublished); *United States v. Smith*, 329 Fed. Appx. 109, 110-11 (9th Cir. June 1, 2009) (unpublished); *United States v. Frazier*, 314 Fed. Appx. 801, 807  (6th Cir. Nov. 19, 2008), *cert. denied*, 129 S. Ct. 1652 (2009) (unpublished); *United States v. Irish*, 285 Fed. Appx. 326, 327 (8th Cir. July 31, 2008) (unpublished); *United States v. Brunson*, 292 Fed. Appx. 259, 261 (4th Cir.  Sept. 11, 2008) (unpublished); *United States v. Gilbert*, 286 Fed. Appx. 383, 386 (9th Cir. July 15, 2008) (unpublished); *see also United States v. Everist*, 368 F.3d 517, 519 (5th Cir. 2004) (pre-*Heller* case recognizing an individual right to keep and bear arms, but upholding 922(g)(1)).

The conclusion that felons may be constitutionally barred from gun ownership reflects an understanding that, while the right to keep and bear arms is individual in nature, a person may forfeit that right (just as he may forfeit his right to vote) through the commission of serious criminal conduct, even if non-violent.  *Richardson v. Ramirez*, 418 U.S. 24, 54 (1974); *see also Lewis v. United States*, 445 U.S. 55, 65 & n.8 (1980) (rejecting constitutional challenge to Section 922(g)(1) pre-*Heller*).

9

The cases upholding convictions under § 922(g)(1) have done so even where a defendant possessed a firearm that could be used for self-defense or when the defendant possessed the firearm inside the home.  *See, e.g., United States v. Rozier*, 2010 WL 724338 (11th Cir. Mar. 4, 2010).  As the Eleventh Circuit has explained, *Heller* noted as a critical question whether the plaintiff, Heller, was *qualified* to possess a firearm:

> *Heller* stated, "[a]ssuming that Heller *is not disqualified* from the exercise of Second Amendment rights, the District must permit him to register his handgun and must issue him a license to carry it in the home. [128 S. Ct. at 2817.] (emphasis added).  This indicates that the first question to be asked is not whether the handgun is possessed for self-defense or whether it is contained within one's home, rather the initial question is whether one is *qualified* to possess a firearm.

*Rozier*, 2010 WL 724338 at *2.

The Supreme Court's conclusion that Heller must be not disqualified from exercising his Second Amendment rights demonstrates that the Supreme Court's statements about presumptively lawful firearm regulations, like § 922(g)(1), were not dicta.  They were necessary to the holding of the case.  Moreover, even if *Heller*'s statements about presumptively lawful firearm regulations could be deemed dicta, lower federal courts are not free to disregard such considered statements by the Supreme Court.  "[C]arefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative."  *Wynne v. Town of Great Falls, South Carolina*, 376 F.3d 292, 298 n.3 (4th Cir. 2004) (quoting *Sierra Club v. E.P.A.*, 332 F.3d 718, 724 (D.C. Cir. 2003)).  As other courts have observed, a lower court that fails to follow dicta by the Supreme Court is likely to frustrate the evenhanded administration of justice:

> The Supreme Court uses dicta to help control and influence the many issues it cannot decide because of its limited docket.  "Appellate courts that dismiss these expressions [in

10

dicta] and strike off on their own increase the disparity among tribunals (for other judges are likely to follow the Supreme Court's marching orders) and frustrate the evenhanded administration of justice by giving litigants an outcome other than the one the Supreme Court would be likely to reach were the case heard there."

*In re McDonald*, 205 F.2d 606, 612-13 (3d Cir. 2000) (quoting *United States v. Bloom*, 149 F.3d 649, 653 (7th Cir. 1998)).

*Heller* made clear that its list of presumptively valid firearms prohibitions was not exhaustive. In finding that § 922(g)(9) also falls within the category of presumptively lawful firearm regulations, the Eleventh Circuit has observed that § 922(g)(1) "does not distinguish between the violent and non-violent offender." *United States v. White*, 593 F.3d 1199, 1206 (11th Cir. 2010). "[B]oth an armed robber and tax evader lose their right to bear arms on conviction under § 922(g)(1)." *Id*. But § 922(g)(9) is much more narrowly tailored to capture only violent offenders, for a defendant must first have committed an assault or battery against a family member. *Id*. Given the focus of § 922(g)(9), "Nothing suggests that the *Heller* dictum, which we must follow, is not inclusive of § 922(g)(9) involving those convicted of misdemeanor domestic *violence*." *White*, 593 F.3d at 1206 (quoting *In re United States*, 578 F.3d 1195 (10th Cir. 2009) (order)). *See also United States v. Booker*, 570 F. Supp.2d 161, 164 (D. Maine 2008) ("as a predictor of firearm misuse, the definitional net cast by § 922(g)(9) is tighter than the net cast by § 922(g)(1)") And again, not only is § 922(g)(9) targeted on *violent* offenders, but also Congress found that often the violent offenses covered by § 922(g)(9) are ones that should genuinely qualify as felony criminal conduct. *See, e.g.*, 142 Cong. Rec. S8831-06 (daily ed. July 25, 1996) (statement of Sen. Lautenberg) (noting that where domestic abusers are prosecuted at all, "one-third of the cases that would be considered felonies if committed by strangers are, instead, filed as misdemeanors."

Other courts have agreed that § 922(g)(9) is presumptively lawful. *See, e.g., United States v. Li*, 2008 WL 4610318, *1-*6 (E.D. Wis. Oct. 15, 2008) (unpublished); *United States v. Wyman*, 2009 WL 426293, *1 (D. Me. Feb. 20, 2009); *United States v. Holbrook*, 613 F. Supp.2d 745, 776 (W.D. Va. May 11, 2009).  Moreover, in *United States v. Emerson*, 270 F.3d 203, 260-64 (5th Cir. 2001), the first federal appellate case to recognize that the Second Amendment protects an individual right to keep and bear arms, the Fifth Circuit held that § 922(g)(8)'s prohibition on firearm possession by persons subject to domestic restraining orders does not violate the Second Amendment in view of the nexus between the possession of firearms by such enjoined persons and the threat of violence to their family members.  *See also United States v. Henry*, 288 F.3d 657, 664 (5th Cir. 2002) (same).

A panel of the Seventh Circuit recently disagreed with these courts and remanded for further analysis of a Second Amendment challenge to § 922(g)(9).  *See United States v. Skoien*, 587 F.3d 803 (7th Cir. 2009).  But the full court agreed on February 22, 2010, to rehear *Skoien* en banc and vacated the panel's opinion and judgment.  Briefing is currently scheduled to be completed by May 10, 2010.

Even before *Skoien* was vacated, moreover, the Seventh Circuit had held that *Heller* and the Second Amendment do not invalidate 18 U.S.C. § 924(c) and do not give a drug dealer a right to possess a firearm in his home for protection from other participants in the drug trade.  *See United States v. Jackson*, 555 F.3d 635, 636 (7th Cir. 2009) ("Jackson says that he lives in a dangerous neighborhood and wanted to protect himself from burglars and other marauders.  That may be so, but his decision to operate an illegal home business also matters.").  If felons may lose their right under the Second Amendment to possess firearms for protection, it should be equally

true that felons and those who commit assault and batteries on their family members may forfeit

their Second Amendment right to possess firearms for hunting.

> **B.**      ***The Fourth Circuit's unpublished opinion in* United States v. Chester *should not be deemed controlling, and even if it were deemed controlling, § 922(g)(9) should still be upheld as constitutional in all of its applications.***

Just one day after the Seventh Circuit agreed to rehear en banc the panel opinion in

*Skoien*, a panel of the Fourth Circuit issued an unpublished opinion that adopted in part the

reasoning of *Skoien*. *See United States v. Chester*, 2010 WL 675261 (4th Cir. Feb. 23, 2010).

The United States promptly sought, and received from the Fourth Circuit, a 30-day extension in

which to file a motion for panel rehearing and rehearing en banc in *Chester* and pointed out that

the panel relied heavily on an opinion that the Seventh Circuit has now vacated.  The United

States believes that *Chester* is wrongly decided.  And because it is an unpublished opinion, it is

not controlling.  *See, e.g., United States v. Maroquin-Bran*, 587 F.3d 214, 217 (4th Cir. 2009)

(rejecting earlier "nonbinding unpublished opinion" of the Fourth Circuit and reaching contrary

result).

This Court should conclude that, in light of *Heller*, § 922(g)(9) is valid under the Second

Amendment just as § 922(g)(1).  But even if this Court were to follow *Chester*'s instructions on

remand, defendant's motion must be denied.  In ordering a remand, the Fourth Circuit observed,

"On remand, Chester must identify the basis of *his* claim to Second Amendment protection and

make a record to support it; to which the government may respond."  2010 WL 675261 at *6.

But *Chester* involved notably a conditional guilty plea, not an attempt as in defendant's present

case to obtain effectively a motion for summary judgment on a defense under Rule 12(b).  Thus,

it did not involve the procedural anomaly that defendant's motion presents. Nothing in the

indictment suggests a valid basis for a particular Second Amendment defense.

More important, *Chester* did not require the district court to follow any particular rigid

mode of analysis on remand and did not require the district court to treat *Skoien*'s analytical

framework as binding.  *Chester* simply said, "The district court should consider and interpret the

historical analysis from *Heller* although it is not bound by the threshold test articulated in

*Skoien*." 2010 WL 675261 at *5.  If this Court concludes that it should follow *Chester*'s

instructions, the United States turns next briefly to the historical evidence.

### C.    *Historical evidence supports the constitutionality of § 922(g)(9).*

It is true that *Heller* referred to the prohibition against felons possessing firearms as

"longstanding," but that cannot be interpreted as meaning that § 922(g)(1), or state statutes

criminalizing firearm possession by felons, have been in place since the founding.  Felonies at

the founding era were typically punishable by death.  Imprisonment as a form of punishment was

rare during the founding era,  *see, e.g., Apprendi v. New Jersey*, 530 U.S. 466, 480 n.7 (2000), no

doubt in large part because a pre-industrial society could not realistically afford incarcerating a

significant number of felons in prison.  Thus, a death sentence was the typical form of

punishment for serious offenses.  *See, e.g., Tennessee v. Garner*, 471 U.S. 1, 13 (1985).  Perhaps

to mitigate those effects, many very serious crimes, such as kidnaping and assault with intent to

murder or rape, were classified as misdemeanors.  *See, e.g., United States v. Watson*, 423 U.S.

411, 439-40 (1976) (Marshall, J., dissenting).  Some of the initial efforts at reform of the harsh

effects of capital punishment for all felonies included "transportation"—sending criminals off to

distant places.  *Cf. Ex Parte Wells*, 59 U.S. 307, 313 (1855) ("conditional pardons by the king do

not permit transportation or exile as a commutable punishment, unless the same has been provided for by legislation.").

The above historical evidence suggests that at the founding era, there would have been little reason to create legislation prohibiting felons from possessing firearms, but at the same time, misdemeanor offenses might generally be viewed as quite serious.  Thus, the Supreme Court's characterization in *Heller* of felon-in-possession statutes being "longstanding" cannot be taken to mean that such statutes were in place at the founding era, and that that their historical roots at founding is the basis for their legitimacy under the Second Amendment.

Of course, § 922(g)(1) was adopted in 1968 and predates Section 922(g)(9) by 28 years, making the former more "longstanding."  *Heller*, 128 S. Ct. at 2816-17.  But again, this distinction might matter if § 922(g)(1) dated to the adoption of the Bill of Rights, or shortly thereafter.  But since both statutes are products of 20th century lawmaking, a gap of approximately three decades between their enactments has no apparent significance for the constitutional analysis.

Although there is no reason to believe that anyone will be able to establish that felon-in-possession statutes were in existence and deemed permissible under the right to bear arms at founding, there is evidence of historical limits on firearm possession that is comparable to the limits in § 922(g) generally.  This historical evidence supports the legitimacy of § 922(g)(9) as much as § 922(g)(1).

Notwithstanding the Declaration of Rights of 1689 (which created the English right to bear arms), Parliament retained the power to regulate firearm ownership and could (and did) disarm groups it considered dangerous.  *See* Memorandum for the Attorney General, Office of

15

Legal Counsel, *Whether the Second Amendment Secures an Individual Right*, 43-48  (Aug. 24,

2004) (describing the right inherited from England as an "individual one" that did not depend on

militia service) (hereinafter "OLC Mem."); Nelson Lund, *The Second Amendment, Heller, and

Originalist Jurisprudence*, 56 U.C.L.A. L. Rev. 1343, 1354 (2009).  The prime example is the

treatment of Catholics, who were considered potentially disloyal and whose ability to bear arms

was therefore severely restricted.  *Heller*, 128 S. Ct. at 2792; *see also id.* at 2798 & n.7;

Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: the

Legal Context of the Second Amendment,* 25 Law & Hist. Rev. 139, 156 (2007).  In addition,

"Parliament granted officers of the Crown the power to disarm any person they judged

'dangerous to the peace of the Kingdom.'"  *Id.* at 155.  "Felons simply did not fall within the

benefits of the common law right to possess arms."  Don B. Kates, Jr., *Handgun Prohibition and

the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 266 (1983).  The history

of the English right to bear arms, therefore, provides no support for the notion that Congress

cannot disarm violent criminals.

    Like Parliament, Colonial governments did restrict firearm ownership by certain groups,

and no evidence suggests that such restrictions were viewed as inconsistent with the right to bear

arms.  Not surprisingly, the inhabitants whose firearm ownership was most restricted were those

thought to pose the greatest danger to the nascent Colonial societies, namely, Native Americans

and those of African descent (both slave and free).  JOYCE LEE MALCOLM, TO KEEP AND BEAR

ARMS 140-41 (1994); Robert J. Cottrol and Raymond T. Diamond, *The Second Amendment:

Towards an Afro-Americanist Reconstruction*, 80 Georgetown L.J. 309, 323-27 (1991).   In

addition, as in England, at least one colony disarmed Catholics.  Churchill, *supra*, at 157

(Virginia).  Moreover, some colonies denied firearms to those who refused to swear a loyalty

oath, a decision that potentially disarmed large segments of the population.  Saul Cornell,

*Commonplace or Anachronism: the Standard Model, the Second Amendment, and the Problem*

*of History in Contemporary Constitutional Theory*, 16 Const. Comment. 221, 228-29 (1999);

SAUL CORNELL, A WELL-REGULATED MILITIA: THE FOUNDING FATHERS AND THE ORIGINS OF

GUN CONTROL IN AMERICA 28-30 (2006); Churchill, *supra*, at 157-60 & n.49.  In 1776, for

example, shortly after adopting a Constitution that included a right to bear arms, Pennsylvania

adopted a loyalty act that had the potential to disarm up to forty percent of the citizens.  Cornell,

*Commonplace or Anachronism*, *supra,* at 228; *see also* Churchill, *supra,* at n.49 (describing a

December 1775 Connecticut statute disarming any person defaming the acts of Congress or the

state assembly); DAVID D. HALL, THE ANTINOMIAN CONTROVERSY: A DOCUMENTARY HISTORY

279 (1990) (Puritans disarmed the "heretic" Antinomians in early Seventeenth Century).

　　　As for criminals, Colonial societies do not appear to have categorically prohibited their

ownership of firearms.  *See, e.g.*, C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*,

32 Harv. J.L. & Pub. Pol'y 695, 696-728 (2009); Carlton F.W. Larson, *Four Exceptions in*

*Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J.

1371, 1374 (2009).   The absence of such laws, however,  may simply reflect "a lack of political

demand,"  Lund, *supra*, at 1354, and therefore does not prove that Colonial societies believed

criminals had a *right* to bear arms.

　　　In fact, the historical record suggests that criminals were permitted to own firearms in

Colonial societies as a matter of  public policy, not right.  In the early years, "the colonies were

small, struggling communities," "profoundly isolated, teetering on the brink of starvation, and at

the edge of the wilderness." LAWRENCE M. FRIEDMAN, CRIME AND PUNISHMENT IN AMERICAN

HISTORY  23 (1993).  For such societies, every able bodied individual was critical to the

community's survival.  Accordingly, while those guilty of the most serious crimes – and

recidivists – were executed, *id.* at 41-42, colonists convicted of lesser offenses were permitted to

return to the community after serving their punishment.  *Id.* at 31.  As for gun ownership,

conditions sometimes mandated that all colonists be armed.  EDMUND S. MORGAN, AMERICAN

SLAVERY, AMERICAN FREEDOM: THE ORDEAL OF COLONIAL VIRGINIA, 239-240 (1ˢᵗ Ed. 1975)

(life in Seventeenth Century Virginia required gun ownership).  Even where gun ownership was

not a necessity, Colonial societies encouraged (and sometimes required) that white males be

armed due to the constant menace of Indian attack or slave revolt.  Kates, *Handgun Prohibition,*

*supra*, at 214.  As long as these dangers persisted, disarming a class of white settlers who could

handle firearms was not likely to be in the colonies' self-interest.

But while disarming criminals may not have been a priority, no evidence suggests that our

forebearers believed that government lacked the power to do so.  Indeed, the documentary record

surrounding the adoption of the Constitution indicates that the right to keep and bear arms was

viewed as limited to law-abiding citizens.  Most significantly, a publication drafted by the

Pennsylvania anti-federalist faction in 1787, after Pennsylvania had ratified the Constitution,

noted that it had offered the following proposal at the Pennsylvania Convention:

> That the people have a right to bear arms for the defense of themselves and their
> own state or the United States, or for the purpose of killing game; and *no law
> shall be passed for disarming the people or any of them, unless for crimes
> committed, or real danger of public injury from individuals; * * * .*

The Address and Reasons of Dissent of the Minority of the Convention of the State of

Pennsylvania to Their Constituents, 1787, *reprinted in* 2 SCHWARTZ, THE BILL OF RIGHTS, A

DOCUMENTARY HISTORY 665 (1971) (emphasis added).  The *Heller* Court described this proposal as both  "highly influential" and a "precursor" to the Second Amendment.  128 S. Ct. at 2804.  For present purposes, the Pennsylvania proposal matters because it not only asserted the right to bear arms, but (unlike the Second Amendment) expressly addressed how that right might be forfeited,  making clear that the government may "disarm[ ]" "the people" "for crimes committed" or "real danger of public injury from individuals."

One recent commentator has dismissed this proposal as not "especially probative" because "it was offered by opponents of the Constitution, and its text is not reflected in the Second Amendment as proposed and ratified."  Larson, *supra*, at  1375.  But the Pennsylvania anti-federalists opposed the Constitution in 1787 because it failed to include a bill of rights. Accordingly, they were "proponents" of the right the Second Amendment ultimately recognized. *See* OLC Mem. at 61-62.  Their proposal therefore demonstrates that, at the time the Constitution was adopted, even the most ardent supporters of  guaranteeing an individual right to keep and bear arms recognized that those who engaged in violent criminal activity should not enjoy its benefits.  Moreover, although the Second Amendment itself proved more "succinct[ ]" than the Pennsylvania proposal, *Heller*, 128 S. Ct. at 2835 (Stevens, J., dissenting), that proposal remains probative of how the Amendment's supporters viewed the balance between public security and the right to keep and bear arms.  *See Heller*, 128 S. Ct. at 2804 (reaffirming "our longstanding view that the Bill of Rights codified venerable, widely understood liberties").

Nor was the Pennsylvania proposal an aberration.  In Massachusetts, Samuel Adams offered a similar amendment at the ratifying convention, recommending "that the said Constitution be never construed to authorize Congress . . . to prevent the people of the United

States who are *peaceable citizens*, from keeping their own arms." SCHWARTZ, *supra,* at 674-75,

681 (emphasis added).  Although not identical to the Pennsylvania proposal, this formulation

likewise reflected an understanding that arms could properly be denied to those who were not

"peaceable," a category that comfortably includes those convicted of domestic violence crimes.

A majority of the New Hampshire state convention adopted an amendment that read

"Congress shall never disarm any citizen, unless such as are or have been in actual rebellion."

Schwartz, *supra*, at 761.  This proposal appears to have been aimed at preventing the sweeping

loyalty acts addressed above.  Although it contained no exception for criminals or citizens who

are not "peaceable," neither did this amendment purport (as did the Pennsylvania proposal) to

recognize a "right to bear arms" or to define its outer limits.

Moreover, the Massachusetts proposal provides support for those scholars who have

argued that "[i]n classical republican political philosophy . . .  [the] right to arms was inextricably

and multifariously tied to that of the 'virtuous citizen.' . . . One implication of this emphasis on

the virtuous citizen is that the right to arms does not preclude laws disarming the unvirtuous

citizens (*i.e.*, criminals) or those who, like children or the mentally unbalanced, are deemed

incapable of virtue."   Don B. Kates, Jr., *The Second Amendment: A Dialogue,* 49 Law &

Comtemp. Probs. 142, 143, 146 (1986); *see* Don B. Kates & Clayton E. Cramer, *Second*

*Amendment Limitations and Criminological Considerations*, 60 Hastings L.J. 1339, 1359-62

(2009); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of*

*Gun Control*, 73 Fordham L. Rev. 487, 492 (2004); Saul Cornell, *"Don't Know Much About*

*History:" The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 679

(2002); Robert E. Shalhope, *The Armed Citizen in the Early Republic*, 49 Law & Contemp.

Probs. 125, 130 (1986) (quoting Seventeenth Century English sources for the proposition that arms should only be placed in the hands of those interested in preserving "publick Peace").  The First Circuit recently relied, in part, on these sources in holding that the right to keep arms does not extend to juveniles.  *United States v. Rene E.*, 583 F.3d 8, 11-16 (1st Cir 2009).

In short, existing historical scholarship demonstrates that, in both England and the colonies, governments could and did disarm people they perceived as dangerous.  Furthermore, The United States has found no sources from the Colonial or early Federal periods arguing that criminals have a right to own firearms, while two highly significant sources assert that they do not.  Accordingly, the history of the right to keep and bear arms in England and Colonial America provides no basis for declining to include Section 922(g)(9) within the category of "presumptively lawful" firearm restrictions recognized in *Heller*.  *United States v. Gieswein*, 346 Fed. Appx. 293 (10th Cir. 2009) (unpublished) (historical analysis does not warrant reconsideration of *McCane*).

> **D.      Even without considering the historical limits on gun possession, courts should find § 922(g)(9) constitutional.**

Even apart from historical analysis, there are compelling reasons why § 922(g)(9) should be upheld as constitutional.  In § 922(g)(9), Congress addressed a particularly dangerous type of misdemeanor, concluding that persons convicted of such violent misdemeanors had often engaged in felonious conduct, and posed an unacceptable risk of future violence.  *See* 142 Cong. Rec. at 5,840 (statement of Sen. Lautenberg)("Domestic violence, no matter how it is labeled, leads to more domestic violence.  And guns in the hand[s] of convicted spouse abusers lead to death."); *id.* at 26,674 (same) (noting that "wife beaters" frequently plead more serious charges "down to a misdemeanor and [get] away with a slap on the wrist.").  And as noted above,

Congress's findings are entitled to deference, even when analyzing a constitutional challenge to Congress's legislation.  *Turner Broad. Sys., Inc.*, 520 U.S. at 195.

Other empirical evidence supports the common-sense conclusion that, when often explosive domestic violence is combined with ready access to firearms, the risk of death and serious injury is greater.  An article in the New England Journal of Medicine found that "keeping a gun in the home was strongly and independently associated with an increased risk of homicide . . . [and] [v]irtually all of this risk involved homicide by a family member or intimate acquaintance."  Arthur L. Kellermann et al, Gun Ownership as a Risk Factor for Homicide in the Home, N. Engl. J. Med. Vol. 329: 1084-1091 (1993).

Unsurprisingly, domestic violence may often occur in the home, as it did in the events giving rise to the charges in this case, and the ready availability of a gun in the home to a defendant who commits domestic violence increases the chances that domestic violence and the firearm will mix.

Another study reports that family and intimate assaults involving firearms are 12 times more likely to result in death than those that do not involve firearms.  L.E. Saltzman et al., Weapon Involvement and Injury Outcomes in Family and Intimate Assaults, 267 J. Amer. Med. Ass'n, 3042 (1992).  A report by National Institute of Justice likewise notes, "Women who were previously threatened or assaulted with a firearm or other weapon are 20 times more likely to be murdered by their abuser than are other women."  U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, Practical implications of Current Domestic Violence Research, 26 (June 2009), available at http://www.ncjrs.gov/pdffiles1/nij/225722.pdfU.

Given that a defendant charged under § 922(g)(9) must have a prior domestic violence conviction and must presently have a firearm, the risks posed by armed assailants in domestic violence offenses are highly relevant—and provide a much stronger basis for upholding § 922(g)(9) than the risks of firearm possession by those previously convicted of making a false statement under 18 U.S.C. § 1001, for example.

The Court in Heller concluded its opinion by emphasizing that it was "aware of the problem of handgun violence in this country," 128 S. Ct. at 2822, and pointedly noted that the Second Amendment does not "protect the right of citizens to carry arms for any sort of confrontation," *id*. at 2799 (emphasis in original). Prohibiting the possession of firearms by persons convicted of crimes of domestic violence should readily fall within the ambit of "presumptively lawful regulatory measures" recognized in Heller. Just as the Court concluded in *Heller*, whatever level of scrutiny is applied, § 922(g)(9) should pass constitutional muster. *See, e.g., United States v. Masciandaro*, 648 F. Supp.2d 779, 787-90 (E.D. Va. 2009) (Ellis, J.) (upholding law against Second Amendment challenge "under any elevated level of constitutional scrutiny").

Section 922(g)(9) should be deemed permissible categorically, for it prohibits firearm possession by individuals who have been convicted of a violent offense. But if more were needed to pass constitutional muster under the Second Amendment—and *Heller* makes plain that more is not needed—a defendant cannot mount a successful facial challenge under either strict or intermediate scrutiny on a pretrial motion to dismiss.

As noted above, outside the First Amendment setting, a statute is facially invalid only if it is unconstitutional in all of its possible applications. *See, e.g., Babbitt v. Sweet Home Chapter of*

23

*Communities for a Great Oregon*, 515 U.S. 687, 699-700 (1995); *United States v. Salerno*, 481 U.S. 739, 745 (1987); *Schall v. Martin*, 467 U.S. 253, 268 n.18 (1984) ("More fundamentally, this sort of attack on a criminal statute must be made on a case-by-case basis.  The Court will not sift through the entire class to determine whether the statute was constitutionally applied in each case.  And, outside the limited First Amendment context, a criminal statute may not be attacked as overbroad.") (citations omitted); *See also, e.g., Washington State Grange v. Washington State Republican Party*, 128 S. Ct. 1184, 1190 (2008) ("While some members of the Court have criticized the *Salerno* formulation, all agree that a facial challenge must fail where the statute has a plainly legitimate sweep.") (internal quotation marks omitted).

Put another way, a defendant may not challenge the constitutionality of a statute based on an argument that, in his view, it could not be constitutionally applied to other differently situated defendants.  *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973) ("Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge the statute on the ground it may conceivably be applied unconstitutionally to others, in other situations not before the Court.").

If this Court does not conclude that § 922(g)(9) is presumptively valid under *Heller*, and concludes that it must choose between strict or intermediate scrutiny, then intermediate scrutiny should apply.  Even the most favorable case for defendant, the now-vacated opinion in *Skoien*, applied intermediate scrutiny.  *See* 587 F.3d at 810-11.  A recent district court opinion in Washington, D.C., explains the reasons for applying intermediate scrutiny.  *Heller*, 2010 WL 1140875 at *6-7.  First, the Supreme Court in *Heller* did not say that the Second Amendment right is a fundamental right.  *Id*. at *7.  Second, applying strict scrutiny would not appear to be

24

consistent with the Court's conclusion that various categories of firearm restrictions are presumptively valid. *Id.* Third, when courts have not concluded that a law was presumptively valid, the weight of authority supports applying intermediate scrutiny in analyzing a Second Amendment challenge. *Id.*

Under intermediate scrutiny, *Heller* again establishes that § 922(g)(9) is constitutional for the reasons recited above. Congress acts well within the Constitution in requiring those convicted of violent acts against family members and intimates from arming themselves with firearms. It is enough that violent misdemeanants are sufficiently similar to felons to place § 922(g)(9) on *Heller*'s list of lawful exceptions. And if that is not enough, the historical evidence that a right to firearm possession was limited to peaceable citizens, and the empirical findings of Congress, show that § 922(g)(9) advances an important government interest and uses a legislative regulation that is substantially related to that goal. It cannot be doubted that preventing shootings during incidents of domestic violence is an important government interest, and a firearm prohibition on those who have been convicted of committing domestic violence sufficiently advances Congress's goal. Again, if Congress may prevent a price fixer from possessing a firearm, it may equally prevent someone like defendant from possessing a firearm after a conviction for a crime of domestic violence. As one district court recently explained, under intermediate scrutiny, "the degree of fit between" the challenge law and "the well established goal of promoting public safety need not be perfect; it must only be substantial." *Heller*, 2010 WL 1140875 at *10.

Moreover, even under strict scrutiny as applied to restrictions on speech, the government may justify some restrictions "based solely on history, consensus, and 'simple common sense.'"

*Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995) (citing *Burson v. Freeman*, 504 U.S. 191, 211 (1992)); *see also City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 451 (2002) (Kennedy, J., concurring) ("very little evidence is required"); *id*. at 452 (regulations on adult bookstores may rest in part on "common experience" and inference).  And given that the Supreme Court has already concluded that § 922(g)(1) passes constitutional muster under the Second Amendment, the same should be true of § 922(g)(9).

### Conclusion

For the reasons stated above, this Court should reject defendant's motion to dismiss the count in the indictment charging him with violating 18 U.S.C. § 922(g)(9).

Respectfully submitted,

Neil H. MacBride
United States Attorney

By:  _____/s/_____
Richard D. Cooke
Assistant United States Attorney
Office of the United States Attorney
600 East Main Street, Suite 1800
Richmond, Virginia 23219
(804) 819-5471
(804) 771-2316 (facsimile)
richard.cooke@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I certify that I filed electronically on April 5, 2010 the foregoing response with the Clerk of the Court using the CM/ECF system, which will send notice of the electronic filing (NEF) to the attorney below:

Paul G. Gill, Esq.
Assistant Federal Public Defender
701 East Broad Street
Suite 3600
Richmond, VA 23219-1884

_____/s/_____
Richard D. Cooke
Assistant United States Attorney
Office of the United States Attorney
600 East Main Street, Suite 1800
Richmond, Virginia 23219
(804) 819-5471
(804) 771-2316 (facsimile)
richard.cooke@usdoj.gov